**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Payment Systems LLC, | No. CV-21-00666-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| BSR Acquisition Company LLC, | |
| Defendant. | |

At issue is Plaintiff National Payment Systems LLC, d/b/a Boom Commerce's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 2, PI Mot.), to which Defendant BSR Acquisition Company, LLC filed a Response under seal (Doc. 14, PI Resp.) and Plaintiff filed a Reply under seal (Doc. 42, PI Reply). The Court held a hearing on Plaintiff's Motion for Preliminary Injunction on May 7 and 10, 2021 (Docs. 60–61; Docs. 68–69, Tr.), and the parties filed Proposed Findings of Fact and Conclusions of Law under seal (Doc. 46, Def.'s FOF; Doc. 56, Pl.'s Am. FOF). The parties filed five additional Motions, comprised of 15 additional briefs, associated with Plaintiff's Motion for Preliminary Injunction, including Plaintiff's sealed Motion to Strike Portions of the Brian Goudie Declaration and Related Exhibits (Doc. 41); Defendant's sealed Motion to Strike Declaration of Stephen J. Scherf in Support of Motion for Preliminary Injunction (Doc. 43); Plaintiff's sealed Motion for Relief Regarding Defendant's Inability to Pay on Judgment (Doc. 58); Plaintiff's sealed Motion to Strike Declaration of Brian Goudie in Support of Defendant's Response to Plaintiff's Motion for Relief Regarding Defendant's Inability to

Pay on Judgment (Doc. 74); and Defendant's Motion to Redact or Partially Seal Transcript (Doc. 91). The Court will also resolve these additional, related Motions in this Order.

## I. BACKGROUND

Plaintiff Boom Commerce and Defendant BSR (also referred to by the name of its parent, "Aurora") are both in the business of providing credit and debit card transaction processing services to merchants. They were parties to an Independent Contractor Agreement ("ICA"), executed in April 2015, under which Boom was responsible for acquiring merchant customers (through promotion, marketing, and solicitation) and BSR was responsible for providing back-end credit and debit card processing services. Typically, Boom was to "board" merchants on behalf of BSR to credit card processing service provider First Data. In return, First Data remitted compensation to BSR in the form of a residual based on a percentage of each merchant's transaction activity, and BSR then remitted a percentage of the residuals to Boom. BSR is referred to as an "independent sales organization" ("ISO") in the payment processing industry, and under the ICA, Boom as an agent of BSR is referred to as a "sub-ISO." A separate Secured Residual Loan Agreement ("SRLA"), in effect between Boom and BSR from July 2017 to June 2020, contained an exclusivity covenant providing that Boom could board merchants only on behalf of BSR, not BSR's competitors. Boom alleges it earned an average of approximately $800,000 per month in residuals for its services to BSR under the ICA.

The present dispute between Boom and BSR centers on certain conditions contained in the ICA, namely, (1) that Boom was responsible for boarding two merchants every six months on behalf of BSR, referred to as the "2/6 Clause" and contained in section 4.7 of the ICA, and (2) that Boom would not solicit boarded merchants, referral partners, agents, and employees of BSR, referred to as the Non-Solicitation Clauses and contained in sections 5.8 and 5.9 of the ICA. In facts that read like a Russian novel, various individuals and entities related to both BSR (or Aurora) and Boom entered into and ended relationships, and sought resolution of their disputes, over the years leading up to this dispute. (*See, e.g.*, Doc. 14-1, Goudie Decl. ¶¶ 6–12.) In short, Sabin Burrell, an

entrepreneur in the payment processing industry, and his wife Kayla Burrell were a part of the BSR/Aurora organizations but parted ways by January 2019, and Mr. Burrell became a part of the Boom organization. Relevant to this proceeding, in December 2019, the parties entered into a Conditional Mutual Release and Settlement Agreement to resolve ongoing litigation between them. The Settlement Agreement modified the ICA and SRLA by, among other things, releasing Boom from its exclusivity covenant with BSR as of December 2019. Moreover, in May 2020, BSR was permitted to select certain merchants that Boom had boarded to be part of BSR's merchant portfolio.

On March 29, 2021, BSR sent Boom a Notice of Termination of Compensation and Notice of Default. (Goudie Decl. Ex. 18.) In the Notice, BSR stated that Boom breached the ICA by violating the Non-Solicitation and 2/6 Clauses and that BSR was taking actions to terminate the monthly residual stream for the merchant accounts Boom had acquired on behalf of BSR under the ICA. Boom disputes that it breached any term of the ICA and contends that BSR's termination of payments under the ICA was improper. Although section 6.11 of the ICA provides that the parties agreed to submit disputes under the ICA to arbitration, it also provides a carveout for the parties to seek injunctive relief in court "where appropriate, to protect [a party's] rights pending the outcome of the arbitration." Boom filed this lawsuit to seek injunctive relief enjoining BSR from withholding compensation due to Boom under the ICA pending the results of the arbitration. (Doc. 1, Compl.)

## II. LEGAL STANDARD

To qualify for preliminary injunctive relief, a movant must demonstrate: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of hardships tips in its favor; and 4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court alternatively may grant temporary injunctive relief where it finds "serious questions going to the merits" exist and a "balance of hardships that tips sharply towards the plaintiff," and the second and fourth *Winter* factors are also satisfied. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

The Court has read, heard, and carefully considered all the arguments the parties presented both in briefing and at the hearing, and the Court will focus here on certain arguments that are dispositive in the Court's resolution of Boom's request for preliminary injunctive relief. In its summation at the hearing, Boom identified seven aspects in which BSR contends Boom breached the ICA. (Tr. at 279.) The Court concludes that, in at least two of those aspects—both of which justify the termination of compensation payable under the ICA—Boom has not demonstrated a likelihood of success on the merits.

#### 1. The 2/6 Clause

First, the Court concludes that Boom likely violated the clear language of the 2/6 Clause of the ICA. Section 4.7 of the ICA provides as follows:

> If this Agreement is terminated by BSR under sections 4.02, 4.03 or 4.04 or [Boom] commits a material breach of the terms of this Agreement that survive the termination of this Agreement, BSR shall have no further obligation for payment of any compensation to [Boom] under this Agreement. In addition, if [Boom] fails to place at least two (2) merchants every six (6) months with BSR, then all compensation payable under this Agreement will terminate.

(Compl., Ex. A, ICA.)

The parties do not dispute that by March 2021, Boom did not place two merchants in six months with BSR or that a breach of this term justifies termination of compensation payable. Instead, Boom argues that it has not violated the 2/6 Clause under the doctrines of waiver and estoppel based on e-mails Brian Goudie—BSR's Chief Executive Officer—sent to John Hynes—Boom's Chief Operating Officer and General Counsel—and on Boom's alleged limited access to certain boarding systems.

Under Arizona law, "[w]aiver is either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment." *Russo v. Barger*, 366 P.3d 577, 580 (Ariz. Ct. App. 2016). And the elements of equitable estoppel are as follows:

- 4 -

> (1) affirmative acts inconsistent with a claim afterwards relied upon; (2) action by a party relying on such conduct; and (3) injury to the party resulting from a repudiation of such conduct. As further consideration, the effect on the public of imposing estoppel must be assessed because estoppel will not be applied to the detriment of the public interest.

*John C. Lincoln Hosp. & Health Corp. v. Maricopa Cty.*, 96 P.3d 530, 535 (Ariz. Ct. App. 2004), *as amended* Sep. 1, 2004.

Boom's principal evidence in support of its waiver and estoppel arguments is in the form of e-mail communications between Boom and BSR. In October 2019, Mr. Goudie sent Mr. Hynes an e-mail that stated as follows:

> I appreciate you/[Boom] trying to work towards the best outcome possible considering the circumstances. I heard you say that the most important outcome for [Boom] was to work towards ending the exclusivity provision in the existing agreement that runs through June 2020. Doing so represents a significant impact on the anticipated revenue of the [Boom] agreement signed in June 2017 with [BSR]. That said, to reiterate, my goal is to move forward in an amicable and respectful fashion now and into the future with [Boom]. With that in mind I propose the following. In exchange for the exclusivity language in section 2.11 of the June 2017 First Amendment to [SRLA] to be amended to say that as of January 1, 2020, [Boom] no longer has any obligation to submit business to [BSR]. [Boom] will sign a full release of [BSR] for the claims in the recently dropped arbitration case and we will expedite the residual purchase process to January of 2020 . . . .

(PI Mot. Ex. E.)

In February 2020, Mr. Goudie sent another e-mail that stated as follows:

> I was notified that [Boom] sent us 4 deals this week. As you know we negotiated a deal to set [Boom] free from boarding with us and we have gotten questions from [First Data] as to if we are still boarding [Boom] accounts which I said we were not. I then found out these 4 came across. Can you tell me why [Boom] would still be sending us accounts if you have your own [First Data] relationship? I want to be sure I am giving [First Data] the right answer. Assuming you have your own [First Data] relationship I would think if we were going to board anything for [Boom] it might be on TSYS.

(PI Mot. Ex. F.)

In addition, Mr. Hynes testified that BSR removed Boom's access to the two boarding systems it had been using to board merchants on behalf of BSR, AccessOne and IRIS CRM, with only temporary reinstatement for limited purposes. (Doc. 3, Hynes Decl. ¶¶ 20–39.)

In his testimony, Mr. Goudie explained the context of his e-mails and clarified Boom's access to the boarding systems. With regard to the October 2019 e-mail, Mr. Goudie stated it was part of the settlement negotiation that was ultimately finalized in December 2019 without removal of the 2/6 Clause from the ICA. (*E.g.*, Tr. at 241.) Indeed, the language of the e-mail—for example, that BSR was "trying to work towards" a settlement—indicates a lack of finality in the e-mail's terms. And there is no evidence that BSR received consideration for the alleged removal of the 2/6 Clause from the ICA. *See Johnson v. Earnhardt's Gilbert Dodge, Inc.*, 132 P.3d 825, 828 (Ariz. 2006) (holding that, under Arizona law, a new agreement "is 'a bargain in which there is a manifestation of mutual assent to the exchange and consideration'" (quoting Restatement (Second) of Contracts §17(1) (1981))).

Mr. Goudie's February 2020 e-mail concerned Boom's submittal of merchant applications to BSR for boarding with First Data, because at this point in time, Boom had its own processing agreement with First Data. Mr. Goudie was thus inquiring why First Data deals were going through BSR. (Goudie Decl. ¶ 48.) The e-mail did not waive or otherwise abrogate the 2/6 Clause, because, among other things, BSR still expected Boom to submit new merchant applications for boarding with TSYS, another processor.[1] (Goudie Decl. ¶ 48.)

With regard to Boom's access to the boarding systems, Mr. Goudie testified that, by June 2020, Boom was the first sub-ISO that BSR put on the access system IRIS, contrary to Mr. Hynes's testimony. (Goudie Decl. ¶ 52 & Ex. 26.) And BSR proffered credible

---

[1] Likewise, Mr. Goudie's testimony shows that only BSR could submit new deals to First Data involving certain point of sale terminals that BSR had previously deployed, even if Boom arranged a new deal involving those terminals, and thus BSR still expected Boom to submit these types of deals to BSR. (Goudie Decl. ¶ 48.)

evidence that Boom always had access to AccessOne, even if it was not Boom's preferred system.

In short, the language of the 2/6 Clause in the ICA was clear; no new agreement was made between BSR and Boom to eliminate the 2/6 Clause; and upon closer inspection BSR's statements and conduct were not inconsistent with the 2/6 Clause such that they constituted a waiver or worked an estoppel against BSR. The evidence likely shows Boom violated the 2/6 Clause, and this in and of itself justified BSR's termination of compensation payable under the ICA.

## 2. The Non-Solicitation Clauses

Next, the evidence presented shows that Boom likely violated the Non-Solicitation Clauses. Section 5.8 of the ICA provides as follows:

> Non Solicitation of Merchants. Without BSR's prior written consent (which consent may be withheld in BSR's sole and absolute discretion), [Boom] shall not knowingly cause or permit any of their employees, agents, principals, affiliates, subsidiaries or any other person or entity to (i) solicit or provide services that compete with the BSR Services to any Merchant that has been accepted by BSR; (ii) to solicit or otherwise cause any Merchant that has been accepted by BSR or its vendors to terminate its participation in any of the BSR Services; or (iii) to solicit or market services to any Merchant that is already directly or indirectly provided any of the BSR Services by BSR, whether or not such are provided under the terms of this Agreement. . . . This section shall apply during the term of this Agreement and for two (2) years after any termination, cancellation or expiration of this Agreement. [Boom] will remain responsible for resulting damages from such prohibited solicitation.

(Compl., Ex. A, ICA.) Relatedly, Section 5.9 of the ICA provides as follows:

> Non Solicitation. (a) During the period that this Agreement is in effect and for the two (2) year period immediately following termination of this Agreement, [Boom] shall not directly or indirectly through another entity . . . (iii) call on, solicit or service any customer, referral partner, affiliate, agent, supplier, licensee, licensor, consultant, contractor or other business relation of BSR or its respective subsidiaries in order to induce or attempt to induce such person to cease doing business with BSR or its subsidiaries, or in any way interfere with the relationship between any such customer,

> referral partner, affiliate, agent, supplier, licensee, licensor, consultant, contractor, or any other business relation and BSR or its subsidiaries (including, without limitation, making any negative statements or communication about BSR or its subsidiaries); or (iv) call on, solicit, or take away or attempt to call on, solicit, or take away any of BSR's customers, referral partners, affiliates, agents and vendors with whom [Boom] became acquainted during its contractual relationship with BSR, either on its behalf or that of another person, firm, or corporation.

(Compl., Ex. A, ICA.)

The Court agrees with BSR that the evidence shows that Boom and its employees and agents likely violated the Non-Solicitation Clauses in several instances. For example, the evidence shows that a Boom employee, Amy Morehead, attempted to solicit the business of a merchant customer of BSR—DA Gallery—by informing the merchant that in order to have a Clover point of sale station, it would need to terminate its BSR agreement and sign a new agreement, which was untrue, and that she would have sales reach out to the merchant. (Goudie Decl. Ex. 5; Hr'g Ex. 9.) The Court finds that the solicitation was clear and does not require a tortured interpretation of the conversation, as Boom argues. And the Court further agrees with BSR that the evidence shows that Gold Star, the sales agent to whom Ms. Morehead referred, is a closely related affiliate of Boom; among other things, both Boom and Gold Star have the same owner, John Beckman. Lastly, the language of the ICA prohibits any attempt to induce a merchant customer away from BSR, whether or not the attempt is successful. Without the benefit of discovery, the evidence already shows that Boom improperly attempted to solicit BSR's merchant customer in DA Gallery, and the same can be said for Chief's Bar & Grill. (Hr'g Exs. 9, 53, 80–83.)

As for solicitation of employees, BSR also proffered evidence that Boom hired away Adam Spencer, BSR's former Chief Operating Officer, ten days before Mr. Spencer resigned from BSR. (Goudie Decl. Ex. 35.)

The Court recognizes that, at a preliminary stage such as this, these questions must be examined without the benefit of all the evidence. But considering the evidence before it, the Court must conclude that Boom has not met its burden to show that it is likely to

succeed in showing it did not violate the Non-Solicitation Clauses. This violation provided BSR with a second justification to terminate compensation payable to Boom.[2]

### B. Balance of Hardships

Although the Court has found that Boom has not demonstrated a likelihood of success on the merits, Boom could conceivably still be entitled to injunctive relief if there are serious questions going to the merits and the balance of hardships tips sharply in its favor.[3] *See Alliance for Wild Rockies*, 632 F.3d at 1135. This dispute is ultimately about money and the related sustainability of the parties' businesses, and Boom argues both that BSR is broke financially—the subject of Boom's Motion for Relief Regarding Defendant's Inability to Pay on Judgment (Doc. 58)—and that Boom itself will imminently be broke financially if the Court does not grant injunctive relief requiring BSR to resume compensation payments to Boom. BSR succinctly characterized Boom's argument at the hearing as, "One or the other goes bankrupt so pick us." (Tr. at 293.) The Court cannot find that the balance of hardships tips in either party's favor, let alone sharply. As a result, Boom is not entitled to injunctive relief under a sliding scale analysis, to the extent it would apply here.

### C. Other Motions

Separate from the briefing on Boom's Motion for Preliminary Injunction, the parties filed five additional, related Motions. First, Boom filed a Motion to Strike (Doc. 41) the Goudie Declaration (Doc. 14-1) that BSR filed with its Response. To begin with, the Court agrees with BSR that, under Local Rule 7.2(m), Boom does not state the statute, rule, or court order providing a basis for the Court to strike the Goudie Declaration. To the extent Boom asks the Court to find certain of Mr. Goudie's statements inadmissible, Local Rule

---

[2] BSR may ultimately succeed in demonstrating Boom's breach of the ICA under its other asserted theories, but the Court declines to go beyond the two theories discussed above, as they are dispositive in the Court's resolution of Boom's request for a preliminary injunction.

[3] BSR argues that the serious questions test does not apply where, as here, the injunction sought is mandatory. (*E.g.*, Tr. at 295.) The Court need not resolve that question in such a blanket fashion, as BSR requests, because the balance of equities does not tip sharply in Boom's favor in this instance.

- 9 -

7.2(m) provides that such an objection must be made in the responsive brief, not a separate motion. Boom's Motion was thus procedurally improper.

Boom's Motion could be more accurately characterized as a motion *in limine*. Boom contends that two-thirds of Mr. Goudie's Declaration is irrelevant (or in some instances lacks foundation) and that it would be "impossible" to cross-examine Mr. Goudie at the preliminary injunction hearing on the contents of his Declaration. In the posture of a preliminary injunction hearing held in a short timeframe and tried to the Court, not a jury, the Court was able to sift out evidence that was irrelevant or lacked foundation from Mr. Goudie's testimony, and indeed ruled on many such objections during the cross and redirect examinations at the hearing. The Court will thus deny Boom's Motion to Strike (Doc. 41) the Goudie Declaration.

Second, BSR filed a Motion to Strike (Doc. 43) the Declaration of Stephen J. Scherf, arguing that it contained new evidence that, because it was included in Boom's Reply, BSR had no opportunity to meet. To the extent the evidence in the Scherf Declaration was relevant and probative to the Court's resolution of Boom's preliminary injunction motion, BSR certainly did have an opportunity to meet the evidence at the hearing. As a result, the Court will deny BSR's Motion to Strike (Doc. 43) the Scherf Declaration.

Third, Boom filed a Motion for Relief Regarding BSR's Inability to Pay on Judgment (Doc. 58), and fourth, Boom filed another Motion to Strike (Doc. 74) pertaining to another Goudie Declaration filed by BSR in conjunction with its briefing on Boom's Motion for Relief Regarding BSR's Inability to Pay on Judgment. The Court agrees with BSR (Doc. 73) that, under the ICA, the parties may only submit a request for preliminary injunctive relief to the Court but must arbitrate all other disputes under the ICA. The Court has denied Boom's request for preliminary injunctive relief, *supra*. Boom's further request for relief is, at best, an end run around the denial of its request for preliminary injunctive relief. The Court will therefore deny Boom's Motion for further relief (Doc. 58) and its associated Motion to Strike (Doc. 74).

Finally, BSR seeks to redact or partially seal the transcript of the hearing in this matter. (Doc. 91.) That request is untimely. The Court held a public hearing on Boom's preliminary injunction motion because the parties did not seek to seal the hearing, and indeed the standard for sealing such a hearing is higher than requesting that a brief in conjunction with a motion be kept under seal. In addition to the untimeliness of its request, BSR has not provided adequate legal support for the Court to seal the record of a public proceeding already held. As a result, the Court will deny BSR's request to redact or partially seal the hearing transcript (Doc. 91). Additionally, because the Court has not disclosed in this Order any information that the parties identified as confidential in their briefs, the Court will file this Order on the public docket.

**IT IS THEREFORE ORDERED** denying Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 2).

**IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike Portions of the Brian Goudie Declaration and Related Exhibits (Doc. 41).

**IT IS FURTHER ORDERED** denying Defendant's Motion to Strike Declaration of Stephen J. Scherf in Support of Motion for Preliminary Injunction (Doc. 43).

**IT IS FURTHER ORDERED** denying Plaintiff's Motion for Relief Regarding Defendant's Inability to Pay on Judgment (Doc. 58).

**IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike Declaration of Brian Goudie in Support of Defendant's Response to Plaintiff's Motion for Relief Regarding Defendant's Inability to Pay on Judgment (Doc. 74).

**IT IS FURTHER ORDERED** denying Defendant's Motion to Redact or Partially Seal Transcript (Doc. 91).

. . . .

. . . .

. . . .

. . . .

1    **IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment
2  for Defendant and terminate this matter, the parties having put before this Court solely the
3  limited issue of whether temporary injunctive relief was warranted.
4    Dated this 29th day of July, 2021.

```
                        _____
                        Honorable John J. Tuchi
                        United States District Judge
```